# 2000 DTA 128

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE SAN JUAN**

L.J. (DORADO), INC.
Recurrente

v.

JUNTA DE CALIDAD AMBIENTAL DE PUERTO RICO
Agencia Recurrida

AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO
Agencia Proponente-Recurrida

Núm. KLRA-2000-00007

San Juan, Puerto Rico, a 31 de marzo de 2000

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano,
la Juez Feliciano Acevedo y el Juez Aponte Jiménez

Aponte Jiménez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La parte recurrente, L.J. (Dorado), Inc., nos solicita que dejemos sin efecto una resolución final enmendada emitida por la Junta de Calidad Ambiental (J.C.A.) mediante la cual dicha agencia recurrida aprobó una Declaración de Impacto Ambiental Final (DIA-F) para el Proyecto Alcantarillado Regional de Dorado. Atendido el recurso ante nuestra consideración y conforme a los fundamentos que a continuación esbozamos, expedimos el auto solicitado, revocamos el dictamen recurrido y devolvemos el caso para la continuación de los procedimientos de forma compatible con lo aquí resuelto.

Según se desprende del expediente ante nuestra consideración, los hechos medulares no están en controversia. La Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (A.F.I.), agencia recurrida, propuso establecer una nueva planta regional para la recolección, tratamiento y disposición de las aguas usadas y generadas en los municipios de Dorado, Vega Alta, Vega Baja, Toa Alta y Toa Baja. Con ello se pretende sustituir las cinco (5) plantas de tratamiento existentes en esos municipios que descargan sus efluentes a los ríos Cibuco y La Plata o sus tributarios. El proyecto propone construir un sistema de troncales sanitarias de aproximadamente noventa (90) millas de largo y dos (2) estaciones de bombeo adicionales a las existentes. Descargarán en una planta regional de tratamiento primario a ser construida en un predio de casi setenta y cinco (75) cuerdas en el Barrio Sabana Seca de Toa Baja. ■ Desde la planta, las aguas sanitarias serán llevadas por tubería soterrada hasta el sector de la Playa Dorado y descargadas en el Océano Atlántico a una distancia de 1,360 metros de la playa, donde comienza una tubería perforada de 340 metros de longitud conocida como *"difusor"*. ■

El costo de construcción del abarcador y ambicioso proyecto se acerca a los $155,000,000 con una inversión

total de $180,000,000 a ser financiada por la agencia proponente. Está condicionado a la obtención de una dispensa por parte de la Agencia de Protección Ambiental Federal *("E.P.A.")* que autorice a descargar aguas usadas al mar después de recibir tratamiento primario, conforme a lo dispuesto en la sección 301(h) de la Ley de Agua Limpia federal (Clean Water Act), 33 U.S.C.A. §1311(h).

El 10 de enero de 1999, la A.F.I. sometió ante la J.C.A. una Declaración de Impacto Ambiental Preliminar (DIA-P) para el mencionado proyecto. A los fines de darle conocimiento al público en general, exhibió copias en las oficinas de la J.C.A., de la A.F.I., de la Junta de Planificación en San Juan, al igual que en las alcaldías de los municipios que servirán el proyecto. Así surge de la resolución recurrida.

El 16 de enero de 1999, la A.F.I. publicó dos (2) avisos ambientales en dos (2) periódicos de circulación general. Su propósito era, además de notificar al público en general, informar a cualquier grupo interesado sobre la disponibilidad de la DIA-P sometida y la audiencia pública a tener lugar el 16 de febrero de 1999 en el Centro de Gobierno del Municipio de Toa Baja. Cancelada la misma, fue reseñalada para el 24 de marzo de 1999; esta vez a celebrarse en el Salón de Asambleas del Centro de Gobierno del Municipio de Toa Alta. El 11 de febrero de 1999 se publicaron los avisos ambientales notificando la nueva fecha y lugar donde se celebraría la audiencia pública.

La J.C.A. nombró un oficial examinador para dirigir el procedimiento investigativo. Le dio la encomienda de recoger los comentarios de la ciudadanía y emitir las recomendaciones correspondientes en cuanto a la adecuacidad del documento. A la audiencia pública comparecieron los proponentes del proyecto, así como diecinueve (19) deponentes. Todos brindaron sus comentarios en su nombre y en el de distintas organizaciones cívicas, culturales, religiosas y gubernamentales. Surge del informe del oficial examinador que algunos de los participantes manifestaron su endoso a la construcción del proyecto, basándose principalmente en las bondades de índole económico y de desarrollo que significaría para la región. Otros expresaron su oposición basada, esencialmente, en consideraciones de carácter ambiental y necesidades regionales. Celebrada la audiencia, el oficial examinador concedió un término adicional de treinta (30) días para que todas las personas que así lo solicitaron sometieran comentarios escritos.

Concluido dicho término, rindió su informe. Recogió los hechos antes reseñados. Cubrió los aspectos de mayor relevancia e importancia traídos ante su consideración a través de las ponencias y escritos presentados. Concluyó que no le correspondía juzgar la deseabilidad de la propuesta de dispensa presentada por la A.F.I. ante la E.P.A. para que autorice la descarga de aguas usadas al Océano Atlántico después de recibir tratamiento primario. Tampoco los aspectos de justicia ambiental, por no ser reglamentariamente aplicables al análisis de adecuacidad de la DIA-P. Señaló, sin embargo, que la DIA-P requería información adicional. Estimó que el documento final debía ampliar los siguientes aspectos:

*"1) La DIA-P no analiza satisfactoriamente el impacto ambiental que tendrá la construcción de noventa (90) millas de troncales y las decenas de millas de líneas laterales que será necesario construir para el funcionamiento necesario de este proyecto. Esta deficiencia representa un fraccionamiento del análisis del potencial de impacto ambiental que no es permitido por el Artículo 4(c) de la Ley de Política Pública Ambiental.*

*2) La DIA-P no analiza satisfactoriamente el potencial de impacto ambiental de la acción propuesta sobre los humedales del área. No se define adecuadamente su localización y, por consiguiente, no se analiza el impacto que la construcción de la planta y los troncales tendrán sobre éstos.*

*3) La DIA-P no discute con suficiente amplitud el efecto ambiental de la disposición de los lodos en los sistemas de relleno sanitario que se contempla utilizar. Debe describirse la localización de los sistemas de disposición y el impacto sobre los mismos.*

*4) La DIA-P no discute adecuadamente las alternativas a la acción propuesta. Es la opinión de este oficial examinador que en el análisis contenido en la DIA-Preliminar, prevalecen las consideraciones de índole*

*económica sobre las consideraciones ambientales. Debe ampliarse y considerarse, desde una perspectiva de impacto ambiental, las alternativas de expansión de las plantas de tratamiento existentes, el tratamiento avanzado con descarga a tierra, el potencial de [reuso] de las aguas y el tratamiento secundario, previo a la descarga al mar. Aunque los aspectos económicos son de gran importancia en el proceso de planificación, éstos deben ser contra pesados a los potenciales impactos ambientales de la acción propuesta. Por tal razón, ambos aspectos, el ambiental y el económico, deben merecer el mismo grado de consideración en la evaluación de las distintas alternativas de la acción propuesta.*

*5) Coincido con la evaluación preparada por el Area de Asesoramiento Científico, en coordinación con el Area de Calidad de Agua y el Area de Mejoramiento de Calidad de Aire de la Junta de Calidad Ambiental. De su informe surge que la DIA-P sufre de las siguientes deficiencias:*

*a) En la página Re-6 del documento ambiental se indica que el predio propuesto para la construcción de la planta de tratamiento está en zona 2. Sin embargo, según el mapa de Zonas Susceptibles a Inundaciones, dicho predio está localizado en Zona 1. Dado esto, se deberá aclarar el asunto.*

*b) En el documento de referencia se indica que se eliminarán 21 de las 23 estaciones de bombeo existentes. Sin embargo, la cantidad de estaciones de bombeo existentes no concuerdan con lo especificado en la Tabla 2-4, ni con lo ilustrado en la Figura 1-1. Se deberá especificar qué acción se tomaría con las estructuras de las estaciones de bombeo a ser eliminadas.*

*c) En la Tabla 3-1 del documento ambiental se somete un resumen de los resultados de los Bioensayos realizados. Sin embargo, no se somete evidencia de la realización de las pruebas agudas para Mysidopsis bahía y Menidia beryllina, ni se incluye el análisis correspondiente para calcular la toxicidad aguda de Champia párvula. Se deberá someter dicha información para nuestra evaluación.*

*d) En la página 3-8 se indica que para las muestras compuestas del efluente se recolectaron muestras de aguas usadas de las cinco plantas de tratamiento existentes en la región. Dado que no se somete información sobre este aspecto, se deberá indicar la proporción de flujos usados para preparar las muestras compuestas del efluente y someter evidencia que justifique dicha proporción.*

*e) Se deberá someter los comentarios a este proyecto emitidos por el Departamento de Recursos Naturales y Ambientales, el Departamento de Agricultura, la Autoridad de Desperdicios Sólidos y el Servicio Federal de Pesca y Vida Silvestre. Incluir también la respuesta a dichos comentarios.*

*f) Dada la cercanía del lugar propuesto para la ubicación de la Planta de Tratamiento Regional con unas facilidades de la Marina de los Estados Unidos, es recomendable los comentarios de dicha agencia al proyecto.*

*g) Se deberá presentar qué alternativas se proponen para la disposición de los lodos extraídos del agua filtrada de la planta de tratamiento.*

*h) Debido a que en el Apéndice 2 no se abunda sobre los humedales existentes en el área propuesta para la planta de tratamiento, deben ampliar y especificar los posibles impactos de este proyecto sobre los humedales del área, incluyendo las medidas de mitigación a ser adaptadas.*

*i) Deben discutir de forma detallada, los posibles efectos adversos de la construcción y operación de todos los componentes del sistema sanitario regional propuesto sobre las comunidades o poblaciones adyacentes a este proyecto. Se deberá indicar las medidas de mitigación a ser implantadas.*

*j) Con respecto a los generadores eléctricos de emergencia para la planta de tratamiento y las estaciones de bombeo, se deberá indicar el volumen del tanque para el almacenamiento de combustible, ubicación y tipo*

*de combustible."*

Conforme a lo anterior, concluyó que el documento sometido *"carec[cía] de cierta información necesaria para cumplir con el Artículo 4C de la Ley Sobre Política Pública Ambiental y sus reglamentos instrumentadores."* Expresó que la A.F.I. debía suplir la información antes indicada y subsanar las deficiencias identificadas, mediante la presentación de un suplemento a la DIA-P. Asimismo, que se incorporara a la DIA Suplementada una discusión de los comentarios hechos por cada una de las agencias consultadas y por el público en general. Por último, recomendó que *"el documento a someterse no sea considerado como DIA-F, hasta tanto la Junta determinara que se han subsanado las deficiencias señaladas en [el] informe."*

La J.C.A. emitió resolución. Adoptó el informe del oficial examinador. No obstante, añadió que no era necesario un suplemento para suplir la información requerida. Indicó que los señalamientos realizados podían y debían ser discutidos en una DIA-Final (DIA-F). Ordenó a la A.F.I. que la sometiera, debiendo incluir en ella las discusiones y comentarios levantados en el proceso.

Según lo dispuesto, la A.F.I. sometió la DIA-F para ser evaluada. La J.C.A. notificó entonces una *"Resolución Final y Notificación".* Aprobó el documento, por cumplir el mismo con todos los requisitos de ley y reglamento, en específico con los señalamientos hechos en el informe del oficial examinador. Advirtió a las partes afectadas de su derecho a solicitar reconsideración y/o revisión judicial y los correspondientes términos para ejercer su prerrogativa. En esa misma fecha se publicó en un periódico de circulación general el aviso ambiental notificando la resolución y la disponibilidad de la DIA-F.

Así las cosas, el Dorado, entidad que no participó en el antes descrito procedimiento de evaluación ambiental del proyecto, solicitó reconsideración. Al día siguiente, la J.C.A. la acogió para ser analizada. Finalmente, notificó una extensa denominada Resolución Final Enmendada y Notificación. Denegó la reconsideración. ▉ Determinó, entre otros, que habiendo la Junta emitido su resolución el 13 de octubre de 1999, previo a la enmienda de la Ley Sobre Política Pública Ambiental incorporada por la Ley Núm. 323 de seis (6) de noviembre de 1999, que descartada la inclusión de determinaciones de hecho y conclusiones de derecho en los procedimientos y trámites ante su consideración, era necesario, no obstante, incluirlas en este caso.

Insatisfecha, Dorado recurre ante nos. Levanta que la J.C.A. y la A.F.I. incumplieron la política pública ambiental de Puerto Rico al omitir publicar la DIA-F en un medio de reproducción electrónica como la *"red Internet",* todo ello en violación de la Ley Núm. 316 de 24 de diciembre de 1998 (12 L.P.R.A. sec. 1124(c)(5)); que la A.F.I. no fue responsiva en la DIA-F en cuanto a las deficiencias señaladas a la DIA-P; que la DIA-F no cumplió con los requisitos de la Sección 5.5.6.1 del Reglamento Núm. 3106 sobre la Declaración de Impacto Ambiental; que al no abundar la DIA-F sobre los datos de las corrientes marinas para las épocas de invierno y primavera, es improcedente exigirle que como parte opositora pruebe la inadecuacidad de los estudios presentados, ya que la J.C.A. tiene la obligación de velar que el análisis y discusión sobre el impacto ambiental referente a las corrientes marinas sea correcto, detallado y adecuado, independientemente de que ello vaya a ser objeto de estudio en la etapa de los permisos.

La J.C.A. se opone. Sostiene, en esencia, que no estaba obligada a publicar la DIA-F en un medio de reproducción electrónica, puesto que ello no era un requisito legal vigente a la fecha de iniciado este procedimiento; que la DIA-F incluyó toda la información requerida para subsanar las deficiencias señaladas en la evaluación de la DIA-P; que la DIA-F sí cumplió con los requisitos de la Sección 5.5.6.1 del Reglamento Núm. 3106; que incluyó los estudios hechos que incorporan datos suficientes sobre las corrientes marinas y contestó los comentarios realizados por el Servicio Federal de Pesca y Vida Silvestre; y que el análisis detallado sobre los estudios de la zona de mezcla y sobre las corrientes marinas, no requiere en esta etapa, sino en la de otorgar el certificado de calidad de agua.

La A.F.I. también se opone. Señala, al igual que --la J.C.A., que al comenzar este procedimiento sobre declaración de impacto ambiental no estaba en vigor la Ley Núm. 316 de 24 de diciembre de 1998, *supra*, ni el Reglamento Núm. 6026 de la Junta de Calidad Ambiental para la Presentación, Evaluación y Trámite de Documentos Ambientales, por lo que son inaplicables al caso de autos; ▉ que la DIA-F presenta contestaciones adecuadas a los comentarios y señalamientos hechos en la evaluación de la DIA-P; que la DIA-F cumple con los requisitos de la Sección 5.5.6.1 del Reglamento Núm. 3106; que en cuanto a los datos de las corrientes marinas, la doctrina de evidencia sustancial requiere que la parte afectada demuestre la existencia en el récord de otra prueba que reduzca o menoscabe el peso de la prueba presentada y, en este caso, Dorado no lo hizo; y que la DIA-F sí incluye una discusión adecuada sobre los estudios de la zona de mezcla y las corrientes marinas, lo cual se pueda evaluar en la etapa de los permisos.

Dorado replicó. Argumenta que la Ley Núm. 316 estaba vigente al momento de emitirse la DIA-F, por lo que había que cumplir con ella. Señala que dicha ley no hace referencia a que aplicará a procedimientos iniciados, después de su vigencia. Añade que cualquier disposición reglamentaria en ese sentido es contraria a la ley y nula. Aduce, también, que el error de la J.C.A. no fue aprobar la DIA-F sin evidencia sustancial, sino cambiar su determinación de inadecuacidad sin prueba alguna, ya que A.F.I. no contestó las deficiencias señaladas, sino que repitió lo dicho en la DIA-P. Reitera su postura en el sentido de que no se cumplió con la sección 5.5.6.1 del Reglamento Núm. 3106. Por último, expone que el estudio hecho en el año 1977 por la firma de consultores Black & Veatch y sometido por la A.F.I., demuestra que las corrientes marinas empujarán la descarga propuesta hacia la playa.

La A.F.I. se opuso a la réplica presentada. Reitera esencialmente los planteamientos realizados en su oposición a la solicitud de revisión. Sostiene que los criterios de la Sección 5.5.6.1 son independientes uno del otro. Señala, además, que el estudio de la firma Black & Veatch trataba de un emisario submarino que estaría a una distancia de 750 metros de la costa mientras que estudios más recientes y comprensivos determinaron que a la distancia actualmente propuesta para el emisario, los resultados son distintos.

Comenzamos por reconocer que la Sección 19 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico establece que *"será política pública del Estado Libre Asociado de Puerto Rico la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...."* 1 L.P.R.A. Art. IV, Sec. 19. En virtud de tal mandato, la Legislatura aprobó la Ley sobre Política Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 y s.s. ) Estableció como fin, una política pública que fomentará la armonía entre las personas y su medio ambiente. Es decir, que promueva la protección y promoción del ambiente y el bienestar de nuestra población, según enunciado en la Sec. 19, Art. VI de nuestra Constitución, *supra*. 12 L.P.R.A. sec. 1122 y 1123; *Municipio de San Juan v. J.C.A.*, **99 J.T.S. 152**, pág. 124.

Dicha ley le impuso a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus subdivisiones, el deber de preparar una declaración de impacto ambiental, antes de llevar a cabo cualquier acción o decisión gubernamental que afecte significativamente el ambiente. 12 L.P.R.A. sec. 1124(c). El propósito de esa declaración es lograr que: *"(i) se consideren a fondo las consecuencias ambientales significativas de la acción o proyecto que se contempla, y (ii) que se informe a las partes concernidas de las consecuencias ambientales aludidas para que todos puedan tomar la acción que estimen pertinente." Municipio de San Juan v. J.C.A., supra; Fed. Pesc. Playa Picúa v. J.P.*, **99 J.T.S. 87**, pág. 1079.

Le corresponde, pues, a la agencia proponente realizar un esfuerzo serio y efectivo por identificar y discutir todas las consecuencias ambientales significativas, o sea, aquellas de importancia que sean previsibles. También debe analizar los pasos a tomarse para mitigar el efecto adverso ambiental que generaría, de ser implementada, la acción propuesta. *Misión Industrial v. J.C.A..*, **98 J.T.S. 77**, pág. 1103.

La J.C.A., por su parte, es el organismo administrativo encargado de examinar cuidadosamente y verificar que se cumplan con los requisitos procesales y sustantivos fijados por la Ley. Le compete finalmente aprobar la DIA. *Misión Industrial v. J.C.A., supra*, pág. 1104; *García Oyola v. J.C.A.*, **97 J.T.S. 25**, pág. 663. Recae sobre ella, primordialmente, la responsabilidad de verificar que la acción contemplada por la agencia proponente representa, en balance, la alternativa con el menor impacto ambiental a la luz de todos los factores legítimos que son pertinentes. Su función ineludible es la de comprobar que se haya observado rigurosamente el esquema jurídico sobre lo ambiental. *Misión Industrial v. J.C.A., supra*, págs. 1104-1105. Sin duda, su labor fiscalizadora es de vital importancia para la observación de la política ambiental de la Isla. En la consecución de esa obligación, debe asegurarse que el trámite exigido no se convierta en un formalismo ritualista.

Las determinaciones relacionadas a la adecuacidad de la DIA están sujetas a revisión judicial. La propia Ley Sobre Política Pública Ambiental establece el alcance de tal remedio. Dispone que el mismo deberá realizarse a base de los procedimientos ante la J.C.A. y que las determinaciones de hecho serán concluyentes si están sostenidas por evidencia sustancial. 12 L.P.R.A. sec. 1135(g). Se trata del mismo alcance que tiene la revisión judicial respecto a las decisiones de cualquier otro organismo administrativo. *Misión Industrial v. J.C. A., supra*, pág. 1105.

En ese sentido, se ha desarrollado la doctrina a los efectos de que sus decisiones, como las de cualesquiera otro organismo administrativo, merecen gran deferencia y respeto por los tribunales. Ello se basa en la experiencia y peritaje que goza en las áreas de su competencia. Cf., *Maisonet Felicié v. Corporación del Fondo del Seguro del Estado*, **96 J.T.S. 169**; *San Vicente Frau v. Policía de Puerto Rico*, **96 J.T.S. 148**. Consiguientemente, sus decisiones gozan de una presunción de regularidad y corrección que rige mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas. *Henríquez v. Consejo de Educación Superior*, 120 D.P.R. 194 (1987).

Ya que la J.C.A. resolvió que en este caso, no obstante la enmienda introducida por la Ley 316, *supra*, y de acuerdo con su interpretación, era menester incluir determinaciones de hecho, debemos señalar que como tribunal apelativo, no intervendremos con ellas si se apoyan en prueba suficiente que surja del récord considerado en su totalidad. Cf., *Metropolitan S.E. v. A.R.P.E..*, **95 J.T.S. 39**; *López v. Junta de Planificación*, 80 D.P.R. 646 (1958); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670 (1953). La norma de sostenerlas prevalece si se basan en evidencia sustancial ▪ obrante en el expediente administrativo. 3 L.P.R.A. sec. 2175.

Todo lo anterior se basa en el principio rector de evitar sustituir el criterio de la entidad especializada por el del foro revisor. *Reyes Salcedo v. Policía de Puerto Rico*, **97 J.T.S. 58**. Es por ello que la parte que impugna la sustancialidad de la prueba, le corresponde establecer la existencia de otra en el récord que reduzca el valor probatorio de la evidencia impugnada de tal forma que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. *Misión Industrial v. Junta De Planificación*, **98 J.T.S. 79.**

La revisión judicial comprende, además de las determinaciones de hecho, las conclusiones de derecho y la concesión del remedio apropiado. *Rivera Rentas v. A & C Development Corp.*, **97 J.T.S. 143**; *Reyes Salcedo v. Policía de Puerto Rico, supra*. En cuanto a las conclusiones de derecho es *de* aplicabilidad la norma de que el foro apelativo puede revisarlas en toda su extensión, siempre que no involucren interpretaciones efectuadas dentro de la zona de especialización de la agencia. *Rivera Rentas v. A & C Development Corp., supra*. En ese caso, merecen deferencia judicial siempre que cumplan y se sujeten al mandato de la ley. *Misión Industrial v. Junta De Planificación, supra*.

De conformidad con lo expuesto, los tribunales no intervendrán con las decisiones de los organismos administrativos, salvo que éstos hubiesen actuado arbitraria, ilegalmente o en forma tan irrazonable que su actuación hubiese constituido un claro abuso de discreción. *Fuertes v. A.R.P.E.*, **93 J.T.S. 165**; *Murphy*

*Bernabé v. Tribunal Superior,* 103 D.P.R. 692 (1975).

De otra parte, la Ley Núm. 316, *supra*, enmienda el Artículo 4, inciso C(v) de la Ley Núm. 9 de 18 de junio de 1970, conocida como la Ley Sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124. Requiere que la agencia proponente, responsable de emitir la DIA, entregue una copia de ella a un medio de reproducción electrónica. Ordena, además, que la J.C.A. publique la Declaración de Impacto Ambiental a través de un medio de fácil acceso y libre de costos, tal como la Internet. La publicación electrónica de la DIA y su acceso al público coincidirá con la fecha de disponibilidad pública de este documento en sus copias de papel (hard copy). A esos fines, autoriza a la J.C.A. para que adopte reglamentos con el propósito de implementar esta ley. La misma comenzó a regir seis (6) meses después de su aprobación, o sea, el 25 de junio de 1999.

Con estos principios conceptuales en mente, pasemos a evaluar el asunto en cuestión. Al emitir la resolución aprobando el informe del oficial examinador, la resolución final y la resolución final enmendada, todas con fechas posteriores al 25 de junio de 1999, la J.C.A. no instruyó a la A.F.I. a presentar el documento en un medio de reproducción electrónica. Al ésta someter la DIA-F el 17 de septiembre de 1999, omitió publicarla en un medio de reproducción electrónica. La J.C.A. tampoco la publicó en un medio de fácil acceso y libre de costos como la red Internet al hacerla pública el 19 de octubre de 1999. Así lo reconocen ambas agencias. Por ende, no hay duda de que se incumplió con lo ordenado en la Ley Núm. 316, *supra*.

· Sobre ese extremo, no nos persuade el argumento de la A.F.I. y de la J.C.A. en contrario, basado en que ese requisito legal no era de aplicación al inicio de este procedimiento tomando como base el Reglamento Núm. 6026 de la Junta de Calidad Ambiental para la Presentación, Evaluación y Trámite de Documentos Ambientales. ▮ Notamos, en primer lugar, que la Ley Núm. 316 en ningún lugar establece que el requisito de publicidad a través de un medio de reproducción electrónica no aplicará a procesos que se hayan iniciado antes de la fecha de vigencia de la ley. Tampoco faculta a la J.C.A. a condicionar la aplicación de la misma. Como correctamente sugiere la J.C.A., la Regla 227(B) lo que hace es evitar problemas de transición entre el Reglamento 6026 y el Reglamento 3106, derogado por aquél, indicando cuándo aplica cada cual. No es base para la pretensión de la A.F.I. y la J.C.A. De serlo, ello atentaría contra su validez. Hay que recordar que los reglamentos están para suplementar las leyes, no para entrar en conflicto con ellas. *P.S.P. v. Comisión Estatal de Elecciones,* 110 D.P.R. 400, 409 (1980). Por ende, se cometió el error señalado.

Por el segundo y siguiente planteamiento, Dorado cuestiona la responsividad de la A.F.I. al corregir los señalamientos expuestos en la DIA-P. Específicamente en cuanto a la deficiencia núm. 4 incluida en el informe del oficial examinador, sostiene que la J.C.A. indicó en su resolución, referente a la DIA-P, que no se discuten adecuadamente las alternativas a la acción propuesta. Por ello, le ordenó a la A.F.I. que ampliara la discusión sobre ese asunto desde el punto de vista ambiental con especial atención a las siguientes alternativas: 1) expansión de las plantas de tratamiento existentes, 2) el tratamiento avanzado con descarga a tierra, 3) el potencial de reuso de las aguas, y 4) el tratamiento secundario previo a la descarga al mar.

Una comparación del contenido de la DIA-P con el de la DIA-F, refleja que, sobre ese punto, la A.F.I. no cumplió con lo requerido. Se limitó a reproducir, en forma más restringida, la discusión expuesta en la DIA-P con excepción de la discusión a la alternativa *"Planta Regional con Tratamiento Secundario Descargado a Emisario y Difusor Submarino Existentes",* y a un Sistema de Tratamiento Terrestre y la de *"Reuso de Agua",* págs. 1.4-6 a la 1.4-11, las cuales fueron adicionadas en la DIA-F.

Apreciamos de los documentos incluidos en el expediente que la discusión de la alternativa *"Expansión de las Facilidades de Tratamiento Existentes",* esbozada en la página 1.4-2 de la DIA-F (págs. 134-135 del apéndice de la oposición de la A.F.I.) es la misma que se encuentra en la página 4-9 de la DIA-P (pág. 466 del apéndice de la oposición de la A.F.I.). Lo mismo ocurre con las restantes alternativas. Referente a la *"Planta Regional con Tratamiento Terciario y Descarga al Río",* en la página 1.4-3 de la DIA-F (pág. 135 del mismo apéndice) aparece igual en la página 4-11 de la DIA-P (pág. 468 del mismo apéndice). En cuanto a la *"Planta*

*Regional con Tratamiento Primario y Emisario Submarino"*, en las páginas 1.4 3 y 1.4-4 de la DIA-F (págs. 135-136 del mismo apéndice) se encuentra igual en las páginas 4-12 y 4-13 de la DIA-P (págs. 469-470 del mismo apéndice).

Asimismo, lo expresado en relación a la *"Planta Regional con Tratamiento Primario Avanzado y Emisario Submarino"*, en las páginas 1.4-4 y 1.4-5 de la DIA-F (págs. 136-137 del mismo apéndice) aparece igual en las páginas 4-14 y 4-15 de la DIA-P (págs. 471-472 del apéndice). Finalmente, lo discutido en relación a la *"Planta Regional con Tratamiento Secundario y Emisario Submarino"* en las páginas 1.4-5 y 1.4-6 de la DIA-F (págs. 137-138 del apéndice) se encuentra en las páginas 4-15 y 4-16 de la DIA-P (págs. 472-473 del apéndice). Asimismo, la A.F.I. resume en la página 1.4-11 de la DIA-F (pág. 143 del apéndice) la evaluación económica hecha en la página 4-21 de la DIA-P (pág. 478 del apéndice). Reproduce además, la tabla 1.4-1 y la tabla 4.1. De esta forma, la A.F.I. no amplió la información desde un punto de vista ambiental. Nos es forzoso concluir, pues, que la A.F.I. no subsanó la deficiencia señalada puesto que, en esencia, repitió en la DIA-F la misma información que incluyó en la DIA-P sobre los extremos señalados.

En relación con el comentario 5(c) también impugnado por Dorado, la J.C.A. específicamente indicó que en la DIA-P se sometió un resumen de los resultados de los bioensayos. Por ello, le requirió a la A.F.I. que incluyera la evidencia de la realización de las pruebas agudas para *"sysidopsis bahía"* y *"Menidia beryllina"* y el análisis correspondiente para calcular la toxicidad aguda de *"Champia párvula"*. Observamos que, a pesar de ello se repite la situación antes descrita en la respuesta al comentario. Nuevamente, la A.F.I. se limitó a reproducir la información contenida en la DIA-P. No hay información adicional y mucho menos contestación adecuada a las deficiencias señaladas. La inmensa mayoría de la discusión elaborada en las páginas 3.1-2 a 3.1-7 de la DIA-F (págs. 156161 del apéndice de la oposición de la A.F.I.), la cual constituye la respuesta a este comentario, es la misma incluida en las páginas 3-8 a 3-11 de la DIA-P (págs. 392-395 de ese mismo apéndice). La restante información es meramete resúmenes de las pruebas realizadas y cuatro (4) tablas que recopilan los resultados de los bioensayos. Esa información no contesta lo solicitado.

De los documentos ante nos tampoco surge que la evidencia requerida haya sido sometida. La A.F.I. ni la J. C.A. han demostrado lo contrario. Igualmente, se hace referencia a que *"...la información de estos estudios [de bioensayos] fue incluida en el apéndice de la DIA-F dentro del estudio de la zona de mezcla"*. ■ Sin embargo, en nuestro expediente no surge dicha información. Por consiguiente, los autos no reflejan que la respuesta de la A.F.I. es adecuada.

En cuanto al comentario 5(d), también impugnado por Dorado, la J.C.A. le señaló a la A.F.I. que debido a que no sometió la información sobre las muestras de aguas usadas de las cinco plantas de tratamiento, debía indicar la proporción de flujos usados para preparar las muestras compuestas del efluente y someter evidencia que justifique dicha proporción. La A.F.I. contestó en la DIA-F. En lo pertinente señaló, que *"[s]egún mencionado en el Apéndice I del Estudio de Mezcla, Correspondencia de la Junta de Calidad Ambiental, se presentaron las muestras de las cinco plantas de tratamiento basándose en el flujo promedio para el 1996"*. Incluyó también la tabla 3.1.4-1 *"Proporción de Flujo Calculada de los Informes de Muestreo de Descarga Para las Cinco Plantas de Aguas Usadas para el 1996"*. ■

Notamos que la información de la tabla 3.1.4-1 contesta parte del requerimiento de la J.C.A. Sin embargo, se repite la misma situación que con el comentario anterior. Otra vez se trae a colación el estudio de mezcla como fuente de evidencia para tratar de subsanar la deficiencia señalada. Nuevamente, no surge en nuestro expediente el aludido estudio de mezcla. No tenemos forma de lograr revisar, si efectivamente esa evidencia establece adecuadamente la información solicitada. Resolvemos que, por lo tanto, la A.F.I. dejó de cumplir con ese requisito.

Referente al asunto planteado por el Servicio Federal de Pesca y Vida Silvestre que se relaciona con el señalamiento de error núm. 4 sobre corrientes marinas levantado por Dorado, dicha agencia comentó, entre

otras cosas, que el estudio sobre ese particular era inadecuado, ya que se limitó prácticamente a las temporadas de verano y otoño. No incluyó un estudio sobre la época de invierno y primavera, las cuales son temporadas en las que el oleaje del norte es fuerte. Cónsono con lo anterior, el informe del oficial examinador recogió la inquietud del Servicio Federal de Pesca y Vida Silvestre. Ordenó a la A.F.I. que contestara ese planteamiento. La J.C.A. acogió tal recomendación. Le correspondía a la A.F.I. Cumplir, ya que la agencia proponente es la obligada a discutir los impactos ambientales de una manera adecuada.

En las páginas 2-52 a 2-55 de la DIA-P (págs. 322-325 del apéndice de la oposición de la A.F.I.) aparece la discusión sobre las corrientes marinas. Allí se señaló que durante la mayor parte del año, prevalecen los vientos fuertes del Este, los cuales influencian de esa forma las corrientes. Añadió que durante octubre y noviembre, los vientos disminuyen, lo que permite que otros factores como la marea, las afecten. Por tal razón, el estudio se realizó en las temporadas de verano y otoño. A base de ello, se concluyó que las corrientes marinas no arrastrarán las aguas usadas a la orilla de la playa. Competía entonces a la J.C.A. verificar que eran adecuados los estudios de corrientes marinas, a tenor del informe del oficial examinador, los cuales no incluian información importante sobre varias temporadas del año sin importar que también serían evaluados en la etapa de permisos.

En la página 3.1-13 de la DIA-F (pág. 167 del mismo apéndice) se encuentra la respuesta hecha por la A.F. I. a la inquietud del Servicio Federal de Pesca y Vida Silvestre sobre ese particular. Apreciamos que la respuesta resume, esencialmente, la información presentada en la DIA-P. Se alude a un estudio de rastreo de boyas realizado en marzo de 1997. Sin apoyo en la preocupación señalada por el informe del oficial examinador, la conclasión incluida en el sentido de que *"ninguna cantidad significativa del efluente regresará a la costa"*, no nos convence. La contestación ofrecida, ciertamente no atiende en forma alguna el planteamiento hecho. No se ofrece información que efectivamente establezca que las temporadas de invierno y primavera se comporten en forma similar a las temporadas de verano y/u otoño. Por tal razón, resulta inaceptable la contestación brindada por la A.F.I. Sin esa información, el estudio de corrientes marinas estaba ausente de data importante. No le competía a Dorado ni al Servicio de Pesca y Vida Silvestre presentar prueba en contrario bajo las circunstancias atinentes. Incidió la J.C.A. al requerirles que probaran con estudios o información pericial la inadecuacidad del estudio efectuado por la A.F.I.

En el comentario 5(f) incluido en el informe del oficial examinador, página 38, cuestionado por Dorado, se encuentra la información vertida en la audiencia pública por la A.F.I. en cuanto a la postura de la Marina de los Estados Unidos sobre el proyecto. Véase, apéndice de la Solicitud de Revisión, página 86. Allí se mencionó que dicho Cuerpo proveyó una lista de seis (6) restricciones, las cuales se enumeran, relacionadas con los detalles de diseño de los edificios y equipo eléctrico que se instalarían como parte del proyecto. La A.F.I. indicó que esas *"restricciones no son significativas, sino que están relacionadas con los detalles de diseño y no al impacto que éste pueda tener sobre el ambiente. Por esta razón, no se incluyó una discusión detallada sobre ese tema en la DIA-P"*. Notamos que la J.C.A., sin embargo, al acoger el informe del oficial examinador, señaló que era recomendable tener los comentarios de la Marina sobre el proyecto.

La respuesta incluida en la página 3.1-17 de la DIA-F (pág. 171 del apéndice de la oposición de A.F.I.), es un resumen de lo antes reseñado sobre las restricciones. Indica que éstas serán discutidas durante la fase de diseño final. La A.F.I. añade que la Marina *"solicitó dibujos, planos y especificaciones de la Planta de Tratamiento Regional para su verificación antes de comenzar la construcción [del proyecto]. Esto también será discutido durante la fase de diseño final"*.

Apreciamos de lo anterior que aunque el informe del oficial examinador recoge información sobre la Marina de los Estados Unidos en relación con el proyecto, la J.C.A. le exigió información adicional a la suministrada. La A.F.I. reprodujo la misma información antes presentada. Ante ello, no cabe duda que se incumplió con lo requerido por la J.C.A. Tampoco la J.C.A. le relevó de ello.

En su quinto señalamiento de error, Dorado aduce que la J.C.A. descartó discusiones sobre aspectos significativos, tales como los estudios de las corrientes marinas y la zona de mezcla bajo el pretexto de que se atenderían en la etapa de los permisos. También tiene razón. La J.C.A. es la entidad encargada de velar que la acción propuesta afecte negativamente el ambiente lo menos posible. Para ello, debe examinar rigurosamente la información presentada en la DIA y los comentarios que con respecto a ella se hagan. Independientemente de que en etapas posteriores en el procedimiento para implementar la acción propuesta, se evalúe la información vertida en la DIA, en esta fase inicial de evaluación ambiental, la J.C.A. tiene la obligación de asegurarse que el análisis ambiental sea adecuado. Así lo exige la envergadura de este proyecto ante las inquietudes sobre el impacto ambiental del mismo. De lo contrario, la J.C.A. dejaría de cumplir con su función fiscalizadora en protección del ambiente.

Finalmente, en la resolución final enmendada, la J.C.A. resuelve que *"... [e]l proceso de análisis ambiental ha terminado según se requiere en la Sección 5.5.7.2 del RDIA (Reglamento 3106 sobre Declaraciones de Impacto Ambiental) para la [J.C.A.] por haberse cumplido con los requisitos de la Sección 5.5.6.1 del RDIA".* Implicó que la DIA-F cumplía con la Sección 5.5.6.1 del aludido reglamento, a pesar del informe rendido por el oficial examinador, adoptado en cuanto a su contenido, el cual concluyó que la DIA-P contenía una discusión inadecuada de los impactos ambientales del proyecto. Al aplicar dicha disposición, también incidió.

La Sección 5.5.6.1 dispone que la agencia proponente podrá considerar la DIA-P, como DIA-F, cuando:

*"A. La DIA-Preliminar preparada satisfaga todos los requisitos del Artículo 4(c) de la Ley Número 9 de 18 de junio de 1970, según enmendada, y de este Reglamento.*

*B. Los comentarios hechos sobre la DIA-Preliminar sean favorables.*

*C. La preparación de una DIA-Final constituya una repetición de la información incorporada a la DIA-Preliminar.*

*Ch. No existen comentarios de importancia que considerar en una DIA-Final, y*

*D. Cuando la Junta [de Calidad Ambiental] así lo recomiende."*

De una mera lectura de estos requisitos antes expuestos, tomando en consideración los hechos particulares de este caso, apreciamos que la Sección 5.5.6.1 no es aplicable al caso de autos. Desde un principio, la DIA-P no cumplió con los requisitos del Artículo 4(c) de la Ley Sobre Política Pública Ambiental 12 L.P.R.A., sec. 1124(c). Múltiples comentarios de importancia no fueron favorables. La DIA-F, bajo las circunstancias atinentes, no puede considerarse como una repetición de información de la DIA-P.

Evaluadas las respuestas al resto de los comentarios recogidos en el informe del oficial examinador impugnados en el recurso, es nuestro parecer que fueron cubiertos en la DIA-F. En ese sentido, estimamos que actuó correctamente la J.C.A. al dictaminar que fueron subsanadas esas fallas.

En concordancia con los fundamentos antes expuestos, resolvemos que las insuficiencias señaladas resultan en la inobservancia de las mismas reglas exigidas por la J.C.A. En cuanto a dichas faltas, estamos impedidos de concederle la deferencia que goza como agencia administrativa en el orden de la revisión judicial. No se necesita del peritaje que caracteriza su función para percatarnos de las irregularidades apuntadas.

Por consiguiente, expedimos el recurso solicitado, revocamos el dictamen recurrido y devolvemos el caso a la J.C.A. a los fines de que la agencia proponente integre la información que adecuadamente responda a las inquietudes y preocupaciones señaladas incluidas en el informe del oficial examinador, adoptado por la agencia. Siendo el presente caso uno apropiado para que se exija una DIA Suplementaria, a los fines de llevar a cabo una

233

evaluación adecuada del impacto ambiental de la acción propuesta, deberá la J.C.A. emitir su decisión al respecto de forma compatible con el informe del oficial examinador que aprobó una vez suplida la información mediante dicho mecanismo, no antes.

Lo acuerda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General